1

2

3

4

5            UNITED STATES DISTRICT COURT

6           EASTERN DISTRICT OF WASHINGTON

7   ROBERT S. BERRY,                    )
                                        )    NOS.  CR-96-0259-WFN-1
8                   Movant,             )          CV-07-0211-WFN
                                        )
9        -vs-                           )
                                        )    ORDER
10  UNITED STATES OF AMERICA,           )
                                        )
11                  Respondent.         )
                                        )
12  ─────────────────────────────────  )

13       Before the Court is Mr. Berry's pro se Motion to Vacate Sentence Under 28 U.S.C.

14  § 2255 (Ct. Rec. 343).  The Motion was supported by a Memorandum (Ct. Rec. 344).

15  Assistant United States Attorney, Thomas Rice filed the United States' Response (Ct. Rec.

16  346).  Movant filed a Reply (Ct. Rec. 347) and Affidavit of Robert S. Berry (Ct. Rec. 348).

17  The Court has reviewed the file, the trial transcript, the Court's trial notes, and the briefing on

18  the Motion, as well as recalled its own memory of the trial. *Shah v. United States*, 878 F.2d

19  1156, 1159 (9th Cir. 1989)(reviewing judge may consider his own notes and memory of trial).

20  For the reasons stated below the Motion is denied.

21                          **I. BACKGROUND**

22       Mr. Berry was indicted on December 5, 1996, on 12 counts with two co-defendants (Ct.

23  Rec. 19).  A trial commenced on March 3, 1997. On April 2, 1997, the jury returned guilty

24  verdicts on Count 1: conspiracy in violation of 18 U.S.C. § 371; Counts 10 and 11: interstate

25  transportation of a stolen motor vehicle in violation of 18 U.S.C. § 2312; and Count 12:

26  possession of unregistered grenades in violation of 26 U.S.C. § 5861(d).  The jury reached

ORDER - 1

no decision on Counts 2 through 9.  A Superseding Indictment was filed April 9, 1997, on Counts 2 through 9 (Ct. Rec. 132).  A second trial commenced on June 19, 1997.  On July 23, 1997, the jury returned guilty verdicts on Counts 2 and 6: destruction of a building used in interstate commerce in violation of 18 U.S.C. § 844(i); Counts 3, 5, 7, and 9: use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c); and Courts 4 and 8: armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d).  Mr. Berry was sentenced on November 4, 1997, to two life terms plus seventy-one years and ten months incarceration (Ct. Rec. 271).  The matter was appealed (Ct. Rec. 273) and a Mandate filed June 21, 1999, affirming the decision of the district court (Ct. Rec. 342).

The instant Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 was filed on July 2, 2007 (Ct. Rec. 343).  Mr. Berry seeks to attack his conviction on Counts 1 through 9.[1]  His Motion is based upon newly discovered evidence that one of the Government's witnesses from the FBI Laboratory, Kathleen Lundy, had admitted providing perjured testimony in another case.  He believes her testimony in his case was critical to linking him to the explosive devices through compositional analysis of bullet lead (CABL) a technique which is no longer used by the FBI. He finally asserts that the statute of limitations on the § 2255 Motion should be equitably tolled because extraordinary circumstances made it impossible to file his petition on time.

## II. DISCUSSION

A Movant may receive 28 U.S.C. § 2255 relief if he can show that: 1) his sentence was imposed in violation of the Constitution or federal law; 2) the court lacked jurisdiction to impose the sentence; 3) the sentence was in excess of the maximum authorized by law;  or 4) the conviction or sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255, ¶ 1. At

---

[1]The sentence on Counts 10 through 12, which Mr. Berry does not attack, was 10 years imprisonment for each count to run concurrently to each other (Ct. Rec. 271).

ORDER - 2

this stage of the proceedings the Court must determine if an evidentiary hearing is required. Rule 8(a), RULES--SECTION 2255 PROCEEDINGS (West 2007). The Court is to review "the answer, [and] any transcripts and records of prior proceedings" in making its determination. *Id.* If an evidentiary hearing is not required the Court may grant habeas relief if a trial error occurred that had a "substantial and injurious effort or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993), *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

**Timeliness of § 2255 Motion.** A § 2255 motion is timely if it is filed within one year of the latest of four possible events enumerated in the statute as:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255, ¶ 6. The Government asserts that the Motion is untimely. Movant argues that sections (2) and (4) are the events that establish the date on which the one year statute of limitations would begin to run and that his Motion is timely. He asserts that knowledge of Kathleen Lundy's perjury and her reliance on a forensic technique that has been found to be unreliable constitutes government action that prevented him from making an earlier motion. Assuming without deciding that both sections are applicable, the question is when was the perjury and decision to not use the CABL technique publicly known and when could the Movant have discovered the information through the exercise of due diligence.

The Government asserts that the Motion is time-barred because the new evidence upon which the Motion is based was publicly available in 2002 and 2005 but the instant Motion

ORDER - 3

1   was not filled until July 2, 2007(Ct. Rec. 343).  Movant does not dispute that Ms. Lundy's

2   perjury was publicly announced by the Associated Press on July 25, 2002, Movant's

3   Memorandum, Ct. Rec. 344, Exh. A, and that the FBI's abandonment of CABL was publicly

4   announced also by the Associated Press on September 2, 2005.  Movant's Memorandum, Ct.

5   Rec. 344, Exh. C.  However, he presents an affidavit stating that he first learned from a fellow

6   prisoner of Ms. Lundy's perjury in September of 2006.  Affidavit of Robert S. Berry, filed

7   10/22/07, Ct. Rec. 348.  He then requested that someone outside the prison research the issue

8   and he received the results of the research and learned of the discontinuation of CABL

9   analysis in the fall of 2006.  Affidavit of Robert S. Berry, filed 10/22/07, Ct. Rec. 348.

10      Section 2244(d)(1) deals with the statute of limitations for federal habeas petitions and

11  § 2255 ¶ 6  addresses statute of limitation for federal prisoner's collateral relief.  Both have

12  nearly identical provisions and are interpreted in concert with one another. *Shannon v.*

13  *Newland,* 410 F.3d 1083, 1088 (9th Cir. 2005).  Thus, cases involving either statute can

14  provide the Court with guidance.  The case most factually similar to the case at hand involved

15  a state prisoner who learned that an expert who had testified at her trial had subsequently been

16  identified as unreliable and his testimony considered to be flawed.  *Ege v. Yukins*, 485 F.3d

17  364, 373-374 (6th Cir. 2007).  The court held that the statute of limitations for her habeas

18  petition would begin to run on the date upon which the state prisoner discovered the factual

19  predicate for her claim, that the expert witness had been discredited.  *Id.*  The Supreme Court

20  has similarly noted that "once the [predicate] facts become discoverable . . . the limitations

21  period will run from the date of notice . . . ." *Johnson v. U.S.*, 544 U.S. 295, 310, n. 8 (2005).

22  Finally, the Ninth Circuit has stated that the "[t]ime begins when the prisoner knows (or

23  through diligence could discover) the important facts, not when the prisoner recognizes their

24  legal significance." *Hasan v. Galaza,* 254 F.3d 1150, 1154, n. 3 (9th Cir. 2001).

25      The Government argues that Movant has failed to meet his burden to show that he

26  exercised due diligence in discovering the facts.  Both cases cited by the Government in

ORDER - 4

support of this argument are factual distinguishable from this case. *Woratzeck v. Stewart*, 118 F.3d 648, 652 (9th Cir. 1997); *Morales v. Ornoski,* 439 F.3d 529, 532-33 (9th. Cir. 2006). In both cases the court concluded that the petitioners had failed to exercise due diligence because they each had known about the problems or possible problems for years before investigating the problems and filing the petitions.

The Government also argues that the statute of limitations would run from the date the facts appeared in the press and were discoverable. But, any inquiry about whether a prisoner exercised due diligence in discovering a factual predicate, has to take into account that "prisoners are limited by their physical confinement." *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004). Movant was not represented by counsel and was a prisoner at a maximum security prison. He represents that he asked someone outside the facility to research the issue when he learned in September 2006 from another prisoner about Ms. Lundy's perjury in a later case. There is no evidence presented upon which the Court could conclude that Movant had received notice of the factual predicate any earlier than what he alleges. Although an exact date in the fall of 2006 cannot be identified as the start of the statute of limitations, the Movant clearly filed his § 2255 Motion within one year by filing it July 2, 2007. The Court finds that the Motion is timely filed.

**Equitable Tolling.** Movant also argues that the statute of limitations for filing his § 2255 Motion should be equitably tolled. Although the Supreme Court has not recognized equitable tolling as applicable to habeas statute of limitations, *Lawrence v. Florida*, __ U.S. __, 127 S. Ct. 1079, 1085 (2007), the Ninth Circuit has found equitable tolling to be an alternative basis for finding a petition to be timely. *United States v. Battles,* 362 F.3d 1195, 1196 (9th Cir. 2004).

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). When

ORDER - 5

prisoners are proceeding *pro se* their allegations must be construed liberally. *Roy v. Lampert*, 465 F.3d 964, 970 (9th Cir. 2006). Here, Movant asserts that: 1) he first learned of Ms. Lundy's perjury in September 2006; 2) he asked someone to research the issues and received that information in fall of 2006; and 3) he filed his Motion in July 2007. As noted previously there are no additional facts that he was on notice of the predicate facts at an earlier time or that the time between receiving the information and filing his Motion showed a lack of due diligence. His allegations are sufficient to support a finding that he was pursuing his rights diligently.

An extraordinary circumstance is some external impediment that caused his untimeliness. *Bryant v. Arizona Atty. Gen.,* 499 F.3d 1056, 1061 (9th Cir. 2007). Examples of external impediments that prevent timely filing include wrongful government conduct, inadequate prison libraries, a prisoner's lack of access to his files, and an attorney's egregious misconduct. *Shannon v. Newland*, 410 F.3d 1083, 1090 (9th Cir. 2005). The circumstance must be beyond the prisoner's control. *Spitsyn v. Moore,* 345 F.3d 796, 799 (9th Cir. 2003). In addition, the prisoner must show a causal connection between the extraordinary circumstance and his failure to timely file his motion. *Id.* Here, the wrongful government conduct is asserted to be the perjury of a government witness in another case that was not discoverable until long after Movant's trial, and the government evidence through that witness of the CABL analysis, that was later discredited. The wrongful conduct here is unlike the examples of external impediments in other cases, but Movant has sufficiently alleged the causal connection between the facts which occurred after his trial, and his inability to file this Motion until he became aware of the information.

Since the Court has already determined that the Motion was timely, it is unnecessary to also find that equitable tolling would apply. It would appear however, that the Movant would be entitled to equitable tolling. Since the Motion is determined to be timely under either analysis, the Court can proceed to evaluate the merits of the Motion.

ORDER - 6

**Merits of the Motion - Are the Requirements for a New Trial Satisfied.**  A 28 U.S.C. § 2255 Motion based upon new evidence is treated as motion for a new trial.  *United States v. Jackson,* 209 F.3d 1103, 1106 (9th Cir. 2000).  Here the parties agree that the Movant is entitled to a new trial if:

> (1) the evidence was newly discovered; (2) [Movant] exercised due diligence in uncovering the new evidence; (3) the new evidence is not merely cumulative or impeaching; (4) the new evidence is material; and (5) the new evidence is such that a new trial would probably produce an acquittal.

*Id.*; see also *United States v. Krasny,* 607 F.2d 840, 843 (9th Cir. 1979).  Each of the five requirements must be satisfied as they are expressed in the conjunctive.  *Jackson,* 209 F.3d at 1106.

A brief recitation of the facts is necessary.  In 1999, Kathleen Lundy took a tour of the Winchester plant that manufactured bullets and made a note that in 1996 the factory switched from purchasing blocks of lead that were required to be remelted before being made into bullets to purchasing billets which did not need to be remelted.  *Ragland v. Commonwealth*, 191 S.W. 3d 569, 580-81 (Ky. Sup. Ct.  2006).  In the summer of 2001, in a Colorado case, she testified to this fact.  *Id.* at 581.  Subsequently, she was advised that her handwritten note was in error and that the factory had switched to purchasing billets in 1986, not 1996.  Ms. Lundy notified the Colorado prosecutor of the error.  *Id.*  In January 2002 she testified at a *Daubert* hearing to the 1996 date in the case of *Ragland v. Commonwealth*.  She knew the date was an error but did not correct it.  *Id.*  At the *Ragland* trial she was impeached based on this error; she indicated she had misunderstood the question at the *Daubert* hearing and  that she knew the date was in error when she testified to it.  *Id.*  She pled guilty to making a false statement under oath, a Class B misdemeanor in Kentucky. *Id.*  A new trial was granted to Mr. Ragland.

In the *Ragland* case the court also noted that Ms. Lundy's opinion was that the bullet that killed the victim was "analytically indistinguishable" from one bullet recovered from defendant's parent's residence and nine of the bullets found in the ammunition box also at

ORDER - 7

defendant's parent's residence. *Id.* at 573-74. She stated that this finding was consistent with the "bullets having originated from the same source, *i.e.,* the same batch of molten lead." *Id.* at 574. The court held this opinion was drawn *ipse dixit* from her metallurgical analysis. *Id.* at 580. The court also noted that the CABL analysis upon which she relied has been withdrawn from use by the FBI due to questions about the reliability and relevancy of CABL. *Id.*

In the case before this Court Ms. Lundy's trial testimony was based upon the now withdrawn CABL. She testified that the number three lead shot in the two bags of shot found in Movant's truck repair shop was analytically indistinguishable from the number three lead shot found at the Planned Parenthood bomb site and that both were 3% antimony. Trial Transcript, Volume 11(July 7, 1997), p. 87 , 89. Due to the similarity she further testified that the shot would have come from a homogenous source but she admitted that she could not tell if the Planned Parenthood shot came from one of Movant's bags because of the larger source. One of the bags from the shop had a Hornaday label and was price marked in a way that was consistent with the White Elephant retail sales store in Spokane, Washington.[2] She testified, and her testimony was corroborated by the testimony of Gregory Hanson, from the Hornaday Manufacturing Company, that Hornaday was changing suppliers in early 1996 and mixed the lead from Ascarco and Doe Run in late February and early March of 1996. Ms. Lundy testified that the composition of the shot she tested appeared to be a mix of the lead from Ascarco and Doe Run. Mr. Hanson testified that 436 bags were run at that time and 24 were shipped to Evergreen which supplies the White Elephant. To his knowledge Hornaday is the only manufacturer that makes lead shot with 3% antimony.

Each of the requirements for a new trial will be addressed in turn.

───────────────

[2]Movant testified at trial that the shot seized in his shop was purchased at the White Elephant.

ORDER - 8

1    <u>The evidence was newly discovered.</u>  As previously discussed, the fact that Ms. Lundy

2    made a false statement under oath and the fact that the CABL is no longer used by the FBI

3    are facts that have developed since the trials in this case which occurred in 1997.  The

4    evidence clearly is newly discovered.

5    <u>Movant exercised due diligence in uncovering the new evidence.</u>  Based upon the

6    Movant's affidavit he did not discover these new facts until the fall of 2006.  As discussed,

7    there is no evidence that he had any notice of the facts before that time, and failed to

8    investigate or exercise due diligence.  Once he learned of the perjury he investigated and filed

9    this Motion within one year.  It is the Court's conclusion that he exercised due diligence.

10    <u>The new evidence is not merely cumulative or impeaching.</u>  Generally, evidence of

11    false statements by a government witness made subsequent to a defendant's trial "will not

12    support a motion for a new trial, because new evidence which is 'merely cumulative or

13    impeaching' is not, according to the often-repeated statement of courts, an adequate basis for

14    a grant of a new trial."  *Mesarosh v. United States*, 352 U.S. 1, 9 (1956).  To impeach is to

15    "discredit the veracity of a witness." Black's Law Dictionary, 8th Ed. p. 768 (2004).

16    Impeachment evidence is defined as "evidence used to undermine a witness's credibility." *Id.*.

17    at 597.  The Government argues that the evidence of Ms. Lundy's false statement conviction

18    would only be impeaching evidence.  It is only when government witnesses or agents plead

19    guilty to or are likely to have exhibited a long history of lying under oath in cases of a similar

20    nature, during the same time frame and where the evidence is material, that  new trials are

21    required because the witnesses credibility is wholly discredited. *Mesarosh v. United States*,

22    352 U.S. 1 (1956); *Williams v. United States*, 500 F.2d 105 (9th Cir. 1974); *United States

23    v. Chisum*, 436 F.2d 645 (9thCir. 1971).

24    In contrast, the Government notes here that while the subject matter was the same,  the

25    perjury was committed 4 ½ years after the witness testified in this case, it was not

26    contemporaneous.  Moreover, while the subject matter of the witness's testimony involved

ORDER - 9

metal testing in this case and the case where the false statement was made, the actual false statement in the prior case was limited to a date which was not at issue in this case.  This Court concludes that Ms. Lundy's perjury was merely impeaching evidence.

In addition however,  Ms. Lundy's testimony was based on The CABL analysis that has since been withdrawn from use.  But, at the time of the trials in 1997 this was conventional scientific wisdom.  *Haynes v. United States,* 451 F. Supp. 2d 713, 720 (D.Md. 2006)(not ineffective assistance of counsel to fail to argue metal analysis presented by Kathleen Lundy was bogus science).  In addition, Ms. Lundy and Mr. Hanson's testimony actually addressed many of the concerns expressed about CABL.  The National Research Council [NRC] found that CABL was the best available analytical methodology but found that it was very difficult to make legally significant interpretations based on the testing because one could not identify a source as there could be coincidentally indistinguishable volumes of lead.  Weighing Bullet Lead Evidence, National Research Council, The National Academies Press (2004).  The NRC cautioned that the CABL testing could not support testimony that a bullet came from a particular box of lead.  *Id.* at 7.  Ms. Lundy, testified consistent with this recommendation that she could not say that the lead shot from the Planned Parenthood bomb came from the bags of shot found at Movant's shop.  Defense counsel did a thorough job of cross-examining the Government's witnesses on this issue at trial.  Clearly, the information regarding the CABL withdrawal would have been in the nature of impeaching evidence.

The new evidence is material.  The Government does not address this requirement and by its silence appears to concede that the evidence of Ms. Lundy's false statement and the withdrawal of  CABL was material.  Material means "having some logical connection with the consequential facts."  Black's Law Dictionary, 8th Ed. p. 998 (2004).  The consequential fact in this case was Movant's guilt and the evidence does have a logical connection with that fact.  If the shot in the Movant's shop was analytically indistinguishable to the shot in the

ORDER - 10

Planned Parenthood bomb there is an increased likelihood that Movant was involved in the charged conduct.

The new evidence is such that a new trial would probably produce an acquittal. Movant argues that the Ms. Lundy's testimony based on the CABL analysis was the "crux" of the government's evidence against Movant, and that the lead analysis was the "primary evidence that linked Mr. Berry to the explosive devices that these convictions are based upon." Movant's Memorandum filed 7/5/07, Ct. Rec. 344. The Government counters that neither piece of new evidence would be sufficient to probably produce an acquittal.

The Court reviewed the trial transcript, its notes of the trial and recalled the testimony and exhibits received. The Court concludes that Movant has failed to satisfy this fifth requirement for a new trial, that the new evidence would probably produce an acquittal. The testimony of Ms. Lundy based on the CABL analysis was only a small piece of evidence related to Movant's involvement in the charged conduct and certainly not the "crux" of the evidence. If the testimony had never been offered, the jury would still have had more than enough evidence upon which to convict the Movant on all counts. Not only was there a significant amount of evidence presented by the Government in this five week trial, but the Movant's alibi defenses were also weak.

Movant's involvement in the charged conduct was supported by the testimony of many witnesses and exhibits, with the following evidence appearing particularly probative on the issue of Movant's guilt. First, Movant was arrested with his two co-defendants on October 8, 1996, as he returned from a round trip from Sandpoint, Idaho to a U.S. Bank in Portland, Oregon. The three vehicles driven by the three co-defendants had survival gear, an M-16 gun, flack jackets, and grenades. The three men had disguises similar to those used in the prior two charged bank robberies that included goggles and latex gloves. Movant's co-defendant, Mr. Barbee , admitted that one of the vehicles, the van, had been stolen. Stolen vans had also been used in the charged bank robberies. Defendants testified that the trip to the Portland

ORDER - 11

1   bank  was merely to leave letters and was a publicity stunt.  Movant testified that he was
2   going to run into the bank and leave a letter while Mr. Barbee held the door and released a gas
3   grenade, with Mr. Merrill doing the diversion.  The  explanation was not credible given the
4   distance they traveled and the significant preparation that they engaged in prior to the trip.

5        Second, three types of weapons (Benelli shotgun, Ruger Vaquero revolver and
6   Winchester pump shotgun) identified in the photographs of the bank robberies were also
7   possessed by Movant according to the testimony of four witnesses: Chris Davidson
8   (confidential witness), Loren Berry (Movant's brother), Donald Blaese (Movant's landlord)
9   and Brad Day (friend of Movant's son) .  Movant testified that he sold the Vaquero
10  revolver in February or March of 1996, but Loren Berry stated he had seen Movant paint the
11  gun black a few days before the July 12, 1996 robbery and then dip it in acid later to remove
12  the paint.  Mr. Davidson testified that the Movant gave him the Winchester to sell after the
13  July 12, 1996 robbery.  Movant retrieved the gun and admitted at trial telling his son to get
14  rid of the Winchester while he was in jail. Just because the Benelli shotgun and Rugar
15  Vaquero revolver were not found during the subsequent execution of the search warrants does
16  not erase the fact that Movant possessed weapons similar to those weapons identified in the
17  bank robberies.

18       Third, parts of letters found on co-defendant's Merrill's computer were similar to letters
19  left at the crime scenes.  Also the letter carried by the defendants on October 8, 1996, was
20  similar in content and was on Merrill's computer and could have been printed on Merrill's
21  printer.  A common thread throughout the trial testimony was the three co-defendants' distain
22  for "usery" which was punishable by death , opposition to abortion which was also a capital
23  crime, their use of the name "Yahweh" for god whose laws were superior to the laws of the
24  United States and reference to the Phinehas priesthood.  Many similar references appeared
25  in the letters left at the crime scenes and mailed to the victims after the crimes.  All three co-
26  defendants testified about their sense that the government was out of control after the events

ORDER - 12

at Ruby Ridge and Waco and that they were waging a war against evil which justified stealing vehicles from corporations.  All three were identified as being pictured in the "Ragged Edge" article published by the Spokesman Review.  Movant admitted he had stopped paying taxes, had obtained false identification and identified "safe houses."

Fourth, the testimony of  Mr. Davidson and  Loren Berry implicated Movant.  Movant made many statements to Mr. Davidson that revealed his interest in and knowledge of the charged conduct.  Loren Berry also heard Movant say the bombers were good guys and were on the right side.  After the July 12 bank robbery Movant told Davidson that he had burned the ponchos that Davidson had sold them.  At trial, counsel for the co-defendants attempted to impeach both of these witnesses.  Loren Berry had an admitted problem with alcohol and telling the truth.  Mr. Davidson dealt in military surplus which raised some questions and was interested in the reward.  Still, some details of their testimony was corroborated by other witness and even by the Defendants themselves, which enhanced the credibility of both witnesses.

Fifth, the height and weight of the teller robber during both bank robberies matched the Movant's height and weight, and the height and weight of the lobby robber during both robberies matched Mr. Barbee's height and weight.  The physical descriptions were also consistent with the two individuals who placed the bomb at Planned Parenthood.  Bank employees testified that the two robberies were very similar and the teller who was robbed twice was 99.99% sure that the teller robber was the same person with a similar black revolver used during both robberies.  Co-defendant Merrill was identified by several witnesses as the driver of the van when both the Spokesman Review and Planned Parenthood were bombed.  He also met the description of the get away driver after the first bank robbery.

Sixth, the April 1, 1996 bank robbery resulted in a loss of $72,000.  All of the defendants took trips in that time frame, Mr. Merrill to Colorado on a road trip, Mr. Barbee

ORDER - 13

and family to Florida by airline, and Movant and family to Michigan also on a road trip. Movant gave his brother Loren $800 in cash in $20 bills during that Michigan trip. Movant also moved his family out of his shop and into a $750 per month rental home when he returned from Michigan, paying his rent in cash. While there was no evidence of flagrant spending, it did appear that cash seemed in better supply than expected given the fact that in 1996 the Defendant admitted he had lost interest in the repair shop business and did just enough to get by. Loren Berry confirmed that fact and several witnesses testified that neither the shop nor the surplus/salvage business appeared to be going concerns.

Movant's alibi defenses were also weak. The first bombing at the Spokesman Review followed by the bank robbery occurred at about 2:30 to 3:00 p.m. on April 1, 1996. Movant testified that he left to drive to Michigan with his family on March 31, 1996. However, his brother, Vernal Berry, testified that he called Movant on March 31, 1996 and Movant said he would leave for Michigan the next day. Vernal Berry further testified that he called on April 2 and Movant was not in Michigan yet. Another of Movant's brothers (Clinton Berry) testified that Movant was in Michigan visiting family on April 3, 1996. On April 11 Movant visited his brother Loren and his family also in Michigan. The jury could easily conclude that Movant left town immediately after the charged events and drove with his family to Michigan.

The second bombing at Planned Parenthood followed by another bank robbery at the same U.S. Bank occurred at about 2:00 p.m. on July 12, 1996. A court clerk (Sherylee Foster) testified that Movant had been in court with his son in Sandpoint, Idaho, on July 12 at about 9:30 am with the hearing concluding at 9:45 to 10:00 am. Movant testified that after the court appearance he went to lunch and then went home. The driving time from the Sandpoint area to Planned Parenthood in the Spokane Valley was about 1 hour and 20 minutes. Movant admitted he had no physical evidence, to substantiate either of his alibis. Again, the jury could easily find this alibi to not be credible.

ORDER - 14

1    The Co-defendants also presented testimony from one person, Pat Thoren, who stated
2    the stolen van used in the first bank robbery was observed on March 29, 1996, in Moses Lake
3    with three people in it that did not match the physical description of the Defendants.  Another
4    witness, Andy Burson, at the drive up window of the bank on July 12, 1996, saw the driver
5    of the van for 5-10 seconds and thought he had a dark brown beard.  Still, the evidence
6    weighed heavily toward a finding of Movant's guilt on the charged conduct.  The Court
7    concludes that Movant has failed to satisfy two of the 5 requirements for a new trial based on
8    new evidence.

9                                    **III. CONCLUSION**

10    Mr. Berry's 28 U.S.C. § 2255 Motion is timely based on the newly discovered evidence
11    he has presented, either under the statute or due to equitable tolling.  He has not however,
12    satisfied the requirements for a new trial based on new evidence.  The evidence of Ms.
13    Lundy's later false statement and the withdrawal of the CABL analysis by the FBI, is merely
14    impeaching.  Further, Movant has failed to show that the new evidence would probably result
15    in an acquittal at a new trial.  The Court is firmly convinced that even if the testimony of Ms.
16    Lundy and Mr. Hanson had been omitted, the jury would have returned guilty verdicts as to
17    Mr. Berry on all charges due to the significant testimony and exhibits presented by the
18    Government.

19                          **IV. CERTIFICATE OF APPEALABILITY**

20    An appeal of this Order may not be taken unless this Court or a Circuit Justice
21    issues a certificate of appealability, finding that "the applicant has made a substantial
22    showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2) (West 2007).
23    This requires a showing that "reasonable jurists would find the district Court's assessment
24    of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473,
25    484 (2000). If a claim is dismissed on procedural grounds the Court must determine
26    whether

ORDER - 15

> jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack*, 120 S. Ct. at 1604.  A certificate of appealability should not be granted unless both components, one directed at the underlying constitutional claims, and the second directed at the court's procedural holding, are satisfied.  *Id.*  The Court may address either the constitutional or procedural issue first. *Id.*  Based on the Court's preceding analysis, the Court concludes: 1) that the Movant has failed to make a substantial showing of a denial of a constitutional right and 2) that jurists of reason would not find it debatable whether the Court was correct in any substantive or procedural ruling. Thus a certificate of appealability should not issue.  Accordingly,

IT IS ORDERED that Mr. Berry's Motion Under 28 U.S.C. § 2255, filed July 2, 2007, **Ct. Rec. 343**, is **DENIED**.

The District Court Executive is directed to:

• File this Order and provide copies to pro se Movant and to the United States Attorney in Spokane, Washington;

• Inform the Ninth Circuit Court of Appeals that if the Movant files a Notice of Appeal that a certificate of appealability is **DENIED**; and

• **CLOSE** the corresponding civil file, **CV-07-0211-WFN**.

**DATED** this 27th day of November, 2007.

s/ Wm. Fremming Nielsen
WM. FREMMING NIELSEN
SENIOR UNITED STATES DISTRICT JUDGE

11-27

ORDER - 16