Walter L. Ayers
Ayers Law Firm, P.L.L.C.
1312 North Monroe Street, Suite 133
Spokane, Washington 99201
Telephone: (509) 252-6005

United States District Court
Eastern District of Washington
(Honorable Wm. Fremming Nielsen)

| United States of America, | No. 2:96-CR-00259-WFN |
|---|---|
| Plaintiff, | Motion Seeking an Indicative Ruling for Compassionate Release |
| v. | |
| Robert Sherman Berry. | Spokane-Without Argument |
| Defendant(s). | February 26, 2021 – 6:30p.m. |

## I. Motion

Robert Sherman Berry, through counsel, Walter L. Ayers, respectfully moves this Court for an indicative ruling regarding compassionate release under 18 U.S.C. §3582(c)(1)(A) and order that his sentence be reduced to time served. Mr. Berry case is currently pending appeal in the Ninth Circuit Court of Appeals for issues pertaining to his September 1, 2020 resentencing. The motion seeks an indicative ruling from this Court pursuant to Fed. R. Crim. P. 37 and FRAP 12.1(b) on the issue of compassionate release.

## II. Facts Relevant to this Motion

Mr. Berry has served nearly 25 years of his sentence on a multi-count

indictment.[1] His currently anticipated release in the Bureau of Prisons (BOP) is July 24, 2042. The amount of time he has served is 54% of his total sentence.

On October 28, 2019, Mr. Berry's life sentence was vacated. A plenary resentencing was ordered by this Court. On September 1, 2020, Mr. Berry was resentenced to 660 months imprisonment with credit for time already served.

After his resentencing, Mr. Berry was transferred to FDC Seatac. There, he petitioned the BOP for compassionate release on December 10, 2020. (Exhibit 1). On January 6, 2021, he was transferred from FDC Seatac to FCI Sheridan. Mr. Berry has not received a determination letter from the BOP as of the filing of this motion. On January 26, 2021 Mr. Berry's Counsel's firm sent a Freedom of Information Act (FOIA) request to FDC Seatac seeking the compassionate release disposition letter from the Warden of that facility. (Exhibit 3). His medical records were also requested. The Department of Justice responded and provided his medical records, but no compassionate release disposition letter. (Exhibit 3).

Counsel's firm sent a letter to the BOP requesting compassionate release on February 19, 2021. (Exhibit 1). This letter was sent to the staff at FCI Sheridan to be forwarded to its warden. The letter was also copied to the staff and warden of FDC Seatac. (Exhibit 1). It included a copy of Mr. Berry's original December 10, 2020 request. (Exhibit 1). The staff at FDC Seatac responded to the email with

---

[1] Mr. Berry's resentencing judgment from September 2, 2020 is attached as Exhibit 1. He has been in custody since his arrest on October 8, 1996.

MOTION SEEKING AN INDICATIVE RULING FOR COMPASSIONATE RELEASE     2

instructions to forward the request to his current facility of placement. FCI Sheridan staff, nor the warden did not respond to the email. (Exhibit 1).

Mr. Berry stated in his petition that he has a compromised immune system, the outbreak of the COVID-19 virus and the inherent dangerousness of confined spaces like prisons, coupled with the BOP's proven inability to adequately deal with the pandemic and his own medical risk factors. He is particularly vulnerable due to his underlying health conditions—specifically his hypertension, high blood pressure and soon to be resurging throat cancer. Mr. Berry has suffered from asthma since his throat surgery and carries a medically prescribed inhaler. He believes that the time he has already served has accomplished the sentencing goals of 18 U.S.C. §3553(a). He presented a release plan in support of his request. This includes living with his wife, and medical care being insured by medicare. (Exhibit 1).

At Mr. Berry's September 1, 2020 resentencing, this Court stated that Mr. Berry may want to "look into" compassionate release. The Court further noted that Mr. Berry has changed after serving 25 years of his sentence. (ECF 514).

Recently, the Ninth Circuit filed an order recommending Mr. Berry to seek an indicative ruling from this Court regarding the issue of compassionate release.

In the next few weeks, Mr. Berry is being transferred to FCI Butner for cancer treatment. FCI Butner has the highest per capita COVID-19 deaths in the

BOP.[2]

### III. Argument

#### a. An Indicative Ruling is Requested Because Mr. Berry's Case is on Appeal in the Ninth Circuit Court of Appeals.

Federal Rule of Criminal Procedure 37 allows district courts to defer consideration on a motion, deny a motion, or state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue. Fed. R. Crim. P. 37. The Ninth Circuit has the authority to grant limited remand to the district court under Federal Rule of Appellate Procedure 12.1. FRAP 12.1(b) states:

> **Remand After an Indicative Ruling**. If the District Court states that it *would grant the motion or that the motion raises a substantial issue*, the court of appeals may remand for further proceedings but retains jurisdiction unless it expressly dismissed the appeal. If the court of appeals remands but retains jurisdiction, the parties must promptly notify the circuit clerk when the district court has decided the motion on remand.

Fed. R. App. P. 12.1(b) (*emphasis added*). Mr. Berry is requesting this Court to make an indicative ruling on the issue of compassionate release as set forth in the Ninth Circuit's Order (Exhibit 2, ECF 521).

Pursuant to the First Step Act of 2018, a sentencing court "may reduce the term of imprisonment":

> …upon motion of the Director of the Bureau of Prisons, or upon motion

---

[2] https://www.northcarolinahealthnews.org/2020/11/09/he-died-before-he-could-sue-over-covid-conditions/

of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendants facility, whichever is earlier… after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that---(i) extraordinary and compelling reasons warrant such a reduction; … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. §3582(c)(1)(A). Since Mr. Berry's case is on appeal, the jurisdiction is divested from this Court. An indicative ruling is required.

### b. **The BOP's Response to the Pandemic Has Been Underwhelming.**

The U.S. Sentencing Commission has promulgated a policy statement applicable to compassionate release motions---U.S.S.G. §1B1.13. The Commentary to that statement provides four categories of circumstances that may constitute extraordinary and compelling reasons for a sentence reduction, including (A) medical conditions, (B) age, (C) family circumstances, and (D) any "other reasons determined by the Director of the BOP.[3] As the Sentencing Commission explained in introducing and amending that commentary, those categories were intended to provide four "*examples* of circumstances" that may qualify for relief---not an exhaustive, restrictive list.[4]

---

[3] *See* U.S.S.G. §1.13 Application Note 1(2018).
[4] U.S.S.G. amend. 698, U.S. Sentencing Comm'n (Nov. 1, 2007, *available at* https://guidelines.ussc.gov/ac/698 (emphasis added); *see also United States v. Trotman*, 829 Fed. App'x 607, 608-09 (4th Cir. 2020) (recognizing that [t]he Sentencing Commission has specific circumstances that constitute 'extraordinary and compelling reasons' for a sentence reduction, including but not limited to the defendant's medical conditions, age, and family circumstances" (emphasis added)).

The Commission's most recent amendment to the categories, resulting in the current version, was specifically "intended to encourage the Director of the Bureau of Prisons to exercise his or her authority" to file motions under the statute when defendants satisfied those criteria.[5] That action was taken by the Commission in response to evidence and concerns that the BOP was not effectively reviewing and presenting potential candidates to the courts. Specifically, "the Commission ha[d] conducted an in-depth review of [the BOP's internal implementation of the statute], including consideration of the Bureau of Prisons data documenting lengthy review of compassionate release applications and low approval rates, as well as two reports issued by the Department of Justice Office of the Inspector General that [were] critical of the Bureau of Prisons' implementation of its compassionate release program."[6] These ongoing failures by the BOP were not new and had been raising red flags for years. Indeed, at least as early as 2013, the House Representatives Committee on Appropriation stated that it was "aware of the recent OIG report on BOP's failure to provide for compassionate release as Congress intended, which included recommendations on ways BOP could protect public safety while generating millions of dollars in savings."[7]

---

[5] *See* U.S.S.G. amend. 799, U.S. Sentencing Comm'n (Nov. 1, 2016), available at https://guidelines.ussc.gov/ac/799 ("799 Amendment").
[6] *Id*.
[7] H.R. Rep. No. 113-171, 2013 WL 3814684, at 47 (July 23, 2013). As early as 2011, the Senate Committee on Appropriations was expressing its "grave[] concern[s] that the current upward trend in prison inmate population is unstable and, if unchecked, will eventually engulf the Justice Department's budgetary resources," and it specifically noted that the BOP "possesses authorities"

The Commission thus held a public hearing on compassionate release in early 2016, at which time it "heard testimony and received public comment concerning the inefficiencies that exist within the Bureau of Prisons' administrative review of compassionate release applications, which can delay or deny release, even in cases where the applicant appears to meet the criteria from eligibility."[8] Recognizing that the BOP Director was the sole gatekeeper between potentially eligible defendants and the courts, the Commission stressed that "the *court* is in a unique position to assess whether the circumstances exist, and whether a reduction is warranted (and, if so, the amount of reduction)" and thus encouraged the BOP to exercise its statutory authority more broadly to provide courts with the opportunity to make that judgment.[9] It even added a new application note—Application Note 4—memorializing that directive."[10]

The 2016 revisions to the Guideline commentary did not suffice. In July 2017, the Senate Committee on Appropriations ordered the BOP to report on its compassionate release actions and statistics within 60 days—including (1) "any steps taken by the BOP to implement the OIG and USSC's recommendations," (2) "for those recommendations not met, BOP's plan for meeting them or reasons why they cannot be implemented," and (3) statistics from the previous five years on

---

to reduce that population through various means, including "expand[ing] the criteria for and use of compassionate release[.]" S. Rep. No. 112-78, 2011 WL 4131394, at 62 (Sept. 15, 2011).
[8] *Id.*
[9] *Id.* (emphasis added).
[10] *Id.*

compassionate release grants and denials, the numbers and nature of prisoner requests, BOP's approval and denial rates, the wait time between receipt of the requests by the warden and the BOP's final decision, and the number of prisoners who died while their requests were pending.[11] Nearly a year later, in June 2018, the Committee was still waiting for that information from the BOP.[12] Accordingly, Congress intervened in December 2018 to make sure that the BOP could no longer act as a firewall to defendants seeking compassionate release from the courts, including a statutory amendment in the First Step Act that would "expand[] compassionate release… and expedite[] compassionate release applications"—one of several steps taken toward remedying issues within the criminal justice system.[13] The amendment was aptly entitled: "Increasing the Use and Transparency of Compassionate Release."[14]

Importantly, §1B1.13 has not been revised since Congress amended the compassionate release statute to create an avenue for defendants to seek relief on their own. Accordingly, the Second, Fourth, Sixth, and Seventh Circuit Courts of Appeals—the only appellate courts to have reached this issue—have unanimously held that § 1B1.13 is not an "applicable policy statement" for defendant-filed motions, as it explicitly and exclusively applies to motions filed by the BOP

---

[11] S. Rep. No. 115-139, 2017 WL 3205578, at 80 (July 27, 2017).
[12] S. Rep. No. 115-275, 2018 WL 2994682, at 86 (June 14, 2018).
[13] 164 Cong. Rec. S7753-01, at S7774 (Dec. 18, 2018) (statement by Sen. Cardin).
[14] *See* First Step Act of 2018, § 603.

Director.[15] The vast majority of district courts, have similarly held that §1B1.13's commentary does not limit their discretion to find extraordinary and compelling circumstances.

### c. Mr. Berry has exhausted his administrative remedies.

Section 3582(c)(1) generally requires inmates to satisfy an administrative "exhaustion" requirement before presenting his own motion for compassionate release to the Court. There are "two routes" for satisfying that requirement, both of which require submitting an administrative request to the warden of the person's facility: (1) "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) waiting 30 days from the date that the warden receives the request.[16]

Mr. Berry has satisfied this administrative requirement in two ways. First, Mr. Berry's compassionate release petition to the warden at FDC Seatac was submitted on December 10, 2020. No response was provided to Mr. Berry after letting 30 days pass, which is all that is required. *See, e.g. U.S. v. Haney*, -- F.Supp.3d--, 2020 WL 1821988 at *3 (S.D.N.Y. April 13, 2020)(to satisfy §3583(c)'s exhaustion requirement, an individual must either exhaust administrative remedies with the BOP or "simply [] wait 30 days after serving his

---

[15] *See United States v. Booker*, 976 F.3d 228, 236-37 (2d Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 281-82 (4th Cir. 2020).
[16] §3582(c)(1)(A); see also *United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (describing the 30-day wait period as one of "two routes" for satisfying the procedural requirement).

petition on the warden of his facility before filing amotion in court."). On February 19, 2021, Mr. Berry's Counsel's office sent a letter with a copy of Mr. Berry's December 10, 2020 petition to the staff and Warden at FCI Sheridan while copying the staff and Warden at FDC Seatac. The staff at FDC Seatac responded that the request should be sent to FCI Sheridan. FCI Sheridan has not responded to the request. The 30 days have lapsed on two different submitted requests with no answer from the BOP. Mr. Berry provided documentation corroborating his claim that he filed a request on December 10, 2020 but that the BOP was requested again on February 19, 2021.

The "prisoner mailbox rule", provides that a pro se prisoner's legal submission is considered filed on the date it is delivered to prison authorities for mailing rather than when it is received by a court. See *United States v. Feucht*, 462 F.Supp.3d 1339, 1341 (S.D. Fla. May 28, 2020); citing *Forde v. Miami Fed. Dept. of Corrections*, 730 Fed. Appx. 794, 800 (11th Cir. 2018). "The United States Supreme Court created this rule because 'a prisoner necessarily loses control of his filing when he gives it to the prison authorities.'" *Forde*, 730 Fed. Appx. 794, 800 (11th Cir. 2018) (citing *Houston v. Lack*, 487 U.S. 266 (1988)). "The Eleventh Circuit later added that the rule is appropriate because '[p]ro se prisoners are unable to file personally in the clerk's office, they cannot utilize a private express carrier, and they cannot place a telephone call to ascertain whether a document mailed for filing arrived." *Garvey v. Vaughn*, 993 F.2d 776, 780 (11th Cir. 1993).

The prisoner must "entrust his court filings to prison authorities over whom he has no control." *Id.* The same rationale should be applied to the Warden's office, where the compassionate release petitions ultimately arrive by prison authorities. "Inmates are not typically handed the keys of the warden's office so they can place their applications for compassionate release on the warden's desk." *U.S. v. Resnick*, 451 F.Supp. 3d 262, 2020 U.S. Dist. LEXIS 59091, at *6 (S.D.N.Y. Apr. 2, 2020).

This clearly ends the exhaustion inquiry. Mr. Berry's motion is ripe for an indicative ruling under Fed. R. Crim. P. 37 on whether this Court will grant compassionate release.[17]

As this Court is well-aware, the COVID-19 pandemic has been raging across the United States for over a year now, hitting prisons especially hard. A circumstance that comes as no surprise to health experts who, for decades, warned of the inherently dangerous combination that prisons and infectious diseases present.[18] As of this filing, over 26 million people in the United States have been

---

[17] The Ninth Circuit has recommended Mr. Berry seek an indicative ruling on the issue of compassionate release. (Exhibit 2, ECF 521).

[18] See, e.g., Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(9): 1047-1055 (2007), http://courses.washington.edu/eh451/articles/prisons.pdf ("The probability of transmission of potentially pathogenic organisms is increased by crowing delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, insufficient infection-control expertise, and prohibitions against the use of proven harm-reduction tools[.]"); Amanda Klonsky, An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues, N.Y. Times (March 16, 2020), https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html?action=click&module=Opinion&pgtype=Homepage ("If you think a cruise ship is a dangerous place to be during a pandemic, consider America's jails and prisons."); "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), https://bit.ly/2W9V6oS (warning that incarcerated individuals "are at

infected with COVID-19, for an infection rate of nearly 8% of the population.[19]
Meanwhile, the Bureau of Prisons reports that over 46,000 inmates have tested
positive out of its total population of around 137,000, for an infection rate of over
33%.[20] The infection rate for staff members is also disproportionately high, at
around 17% based on the BOP's reported numbers.[21]

      Mr. Berry made a good faith effort to request compassionate release on
December 10, 2020 with no response from FDC Seatac. (Exhibit 1). Mr. Berry's
Counsel's Office made a public record request to obtain both the compassionate
release decision letter and his medical records from the BOP. (Exhibit 3). Counsel
received the medical records, but no compassionate release disposition letter.
(Exhibit 3). Mr. Berry again made another good faith effort to request
compassionate release through his attorney's office. The BOP was on notice of his

---

special risk of infection, given their living situations," that they "may also be less able to participate in proactive measures to keep themselves safe," and that "infection control is challenging in these settings"); *United States v. Zukerman*, 2020 WL 165880, at *5 (S.D.N.Y Apr. 3, 2020) (recognizing that "social distancing is impracticable if not impossible" in the close living quarters of prisons, where inmates must rely on guards and others to provide meals and direct all movement).

[19] *Cases of Coronavirus Disease (COVID-19) in the U.S.*, Center for Disease Control and Prevention, (Feb. 4, 2021), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[20] *COVID-19 Cases*, Fed. Bureau Prisons (Feb. 4, 2020), https://www.bop.gov/coronavirus/.

[21] There is reason to believe that the BOP's numbers underreport the actual infection rates for its facilities. See, e.g., Walter Pavlo, Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison, Forbes (Apr. 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/?sh=774a0f087ba3 (identifying other underreporting issues early in the pandemic). Additionally, the BOP posted numbers of "recovered" inmates in its facilities often decrease over time, presumably removing from the statistics the people who became infected in prison but were subsequently release. Thus, the total number of individuals who have been infected in BOP is likely much higher.

request months ago.

### d. Mr. Berry's Medical Vulnerabilities Constitute Extraordinary and Compelling Reasons to Reduce His Sentence and Release Him from Prison.

#### 1. Mr. Berry's Preexisting Conditions Make Him Uniquely Susceptible to Serious Illness If He Contracts COVID-19 In Prison.

Mr. Berry falls within the category of individuals who are at heightened risk of serious complications from COVID-19. He is 66 years old. He suffers from hypertension and is also a cancer survivor (squamous cell carcinoma) who's cancer is recurring. He is anticipated to undergo chemotherapy. Due to squamous cell carcinoma, he had a cervical lymph node biopsy. Additionally, his jugular vein was compromised by the disease. The lump that was taken out of his neck caused him to get dizzy and pass out. In these circumstances, courts have little trouble intervening. *See, e.g., U.S. v. Lacy*, 2020 WL 2093363 (C.D. Ill. May 1, 2020) (reducing sentence in drug distribution case from 80 months to time served at FCI Forrest City based on Covid-19 since individual suffered from comorbidities, including obesity, hypertension, and diabetes), *see also U.S. v. Poole*, --F. Supp.3d--, 2020 WL 4192280 (W.D. Ten. July 14, 2020) (Reducing sentence in drug distribution and §924(c) case from 270 months to time served at FCI Forrest City based on Covid-19 since individual suffered from comorbidities, including diabetes and hypertension), *see also U.S. v. Lavy*, 2020 WL 3218110 (D. Kan. June 15, 2020) (Reducing sentence in bank robbery case from 48 months to time-served at FCI

Forrest City based on Covid-19 since individual suffered from hypertension and mental health issues).

Mr. Berry also has a provocative history of having a viral upper respiratory infection. He also has Gastro-esophageal reflux disease with bleeding, and unspecified hemorrhoids. (Exhibit 4). This means that if he catches COVID-19, his chances of death are quite high.

Mr. Berry's conditions make him especially vulnerable to experiencing severe illness, complications, or death from COVID-19 if he contracts the virus in prison. The CDC identifies hypertension as a condition that "might increase your risk of severe illness from COVID-19" and indicates that people with hypertension face a risk of hospitalization that is three times higher than those without preconditions.[22] A study of the prevalence of comorbidities in coronavirus patients in Wuhan, China—where the first outbreak occurred—revealed that hypertension was among the most prevalent comorbidities in hospitalized patients.[23] Similarly, the Journal of the American Medical Association published a study of 5,700 patients hospitalized with COVID-19 in the New York City area finding that

---

[22] *People with Certain Medical Conditions*, CDC (updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html ("CDC Risk Factors"); *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*, CDC (Aug. 8, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/covid-data/hospitalization-underlying-medical-conditions.pdf.

[23] Jing Yang, et. Al., *Prevalence of comorbidities and its effects in coronavirus disease 2019 patients: A systemic review and meta-analysis*, Int'l Journal of Infectious Diseases, 94 (2020): 91-95, at Abstract (Apr. 3, 2020), https://www.ijidonline.com/article/S1201-9712(20)30136-3/pdf.

MOTION SEEKING AN INDICATIVE RULING FOR COMPASSIONATE RELEASE       14

hypertension was among "[t]he most common comorbidities," with 56.6% of hospitalized patients having the condition.[24] More recent studies have continued to find that hypertension is the "most prevalent comorbidity in patients hospitalized for COVID-19," further finding that it is "also a risk factor for acute kidney injury" and that "[h]ypertension alone was linked to increased rates of mortality."[25] In short, "[i]t is now quite evidence that people with hypertension are also more likely to develop severe complications from the coronavirus."[26]

### 2. Mr. Berry's Prior History, Clean Prison Record and Family Support Suggest That He Is Exactly the Type of Offender Worthy of Compassionate Release.

Mr. Berry appeared before this Court on September 1, 2020 for resentencing. There, the Court acknowledged that Mr. Berry had been rehabilitated and was no risk to the public. (ECF 514, *31 and *32). The Court noted that Mr. Berry helped others. *Id*. He taught others. *Id*. And he helped them with their legal troubles. *Id*. The Court indicated that Mr. Berry has a lot of family support. (ECF 514, at *32).

---

[24] Safiya Richardson, et al., *Presenting Characteristics, Co morbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020) https://jamanetwork.com/journals/jama/fullarticle/2765184.

[25] Darlene Dobkowski, MA, and Rajesh Mohandas, MD, *Studies find hypertension most prevalent comorbidity in patients hospitalized for COVID-19*, CardiologyToday (Sept. 10, 2020), https://www.healio.com/news/cardiology/20200910/hypertention-may-affect-outcomes-in-covid19%20; see also Am. Col. Of Cardiology, *ACC Clinical Bulletin: COVID-19 Clinical Guidance for the CV Care Team*, https://www.acc.org/~/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/2020/02/S20028-ACC-Clinical-Bulletin-Coronavirus.pdf (noting the higher death rate for patients with hypertension).

[26] Hanna Gaggin, MD, MPH, and Kemar Brown, MD, *Hypertension, health inequities, and implications for COVID-19*, Harvard Health Publishing (Nov. 18, 2020), https://www.health.harvard.edu/blog/hypertension-health-inequities-and-implications-for-covid-19-2020111821348.

The Court also thought Mr. Berry had a respect for the law that he did not have in 1997. (ECF 514, at *32).

Mr. Berry has a exemplary prison record based upon the PSIR. See ECF 503 ¶145-153. His last disciplinary issue was in 2003, nearly 20 years ago. All his violations were minor non-violent infractions. Another indication of Mr. Berry's changes was his decision to participate in the pre-sentence interview in 2020. An event he declined in 1997. *See U.S. v. Davis*, 2020 WL 4049980 (C.D. Ill. July 20, 2020) (Finding no community danger for an individual serving 240-month drug sentence, in part, because "Defendant has not committed any disciplinary infractions since 2017."), *see also U.S. v. Somerville*, 2020 2781585 (W.D. Pa. May 29, 2020) (Finding no community danger, in part, because the individual "has not had any disciplinary violations in at least the past 6 months.").

### 3. **Mr. Berry does not pose a danger to the community and his release is supported by the §3553(a) factors.**

Finally, Mr. Berry's record shows that he does not pose a danger to society if he is released, and the §3553(a) factors weigh strongly in favor of release in his case. Mr. Berry has served 25 years of his sentence. Mr. Berry is not being let off lightly. He has already served 54% of his sentence, a fact courts also find persuasive when weighing the §3553(a) factors. *See, e.g., U.S. v. Ivory*, 2020 WL 4581738 (D. Kan. July 28, 2020) (granting compassionate release at FCI Forrest City when individual was 77%--204 of 262 months—into a sentence for guns).

Given Mr. Berry's age, 66, he is statistically unlikely to recidivate. The Sentencing Commission has found—time-and-again—that "[o]lder offenders [are] substantially less likely than younger offender to recidivate following release," with that recidivism percentage hovering somewhere around 13.4%.

Mr. Berry engaged in criminal behavior nearly two and a half decades ago when he was far younger and healthier. He is neither interested nor able to re-offend. A decline in health (in addition to time) influences courts assessing danger. *See, e.g., U.S. v. Chapman*, 2020 WL 2850984 (N.D. Ill. June 2, 2020) ("However, as stated, he has served over 85% of his sentence for those offenses and is nearly a decade older and in much poorer health. So, while his risk of recidivism was certainly a factor at sentencing, it is (hopefully) reduced due to his ill health and advanced age."). Mr. Berry has had a significant decline in his health and is very unlikely to engage in criminal behavior at this point in his life.

Mr. Berry has the strong support of his family, who will help ensure his successful reintegration into society. During incarceration, he has shown a commitment to turning his life around by staying out of trouble for most of his prison term and attending and completing programming that was available to him. Granting a sentence reduction would be entirely consistent with the §3553(a) factors because of the time he has spent in prison has been sufficient to deter him from future crime, punish him for his offenses, protect the public, and provide him with needed correctional treatment, and his rehabilitative needs will be more

effectively addressed in a community program where he will have the encouragement and assistance of his strong family support system.

### IV. Conclusion

Considering all the statutory factors, the Court should provide an indicative ruling that Mr. Berry be granted compassionate release and his sentence of imprisonment be reduced to time served. Mr. Berry's medical conditions have left him vulnerable to a brutal infectious disease that is rampaging BOP facilities, causing the deaths of hundreds of federal inmates in BOP custody. As the United States passes a death toll of 500,000 Americans, Mr. Berry's fears of contracting COVID-19 and suffering devastating consequences are well-founded. He respectfully requests this Court to provide an indicative ruling that it would grant his motion for compassionate release and reduce his sentence to time served.[27]

///

///

///

///

///

---

[27] Mr. Berry requests leave of the Court to file additional supplemental information as it becomes available from FCI Sheridan and the BOP. Before inclusion in this record, Mr. Berry has been informed that an internal review of his doctor's recommendation must be completed before FCI Sheridan will release the report to Counsel for inclusion to supplement this record. However, Counsel is informed and believes that the doctor's report will indicate a recommendation for compassionate release.

Dated this 26th day of February 2021.

Respectfully Submitted,

*s/Walter L. Ayers*_____
WSBA # 19707
Attorney for Robert Sherman Berry
Ayers Law Firm, P.L.L.C.
1312 N. Monroe Street, Suite 133
Spokane, WA 99201
Telephone/Fax: (509) 252-6005
Email: walter@ayerslawfirm.net

## **CERTIFICATE OF SERVICE**

I, WALTER L. AYERS, hereby certify that on February 26, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Assistant United States Attorney Joseph Harrington.

*s/Walter L. Ayers*_____
WSBA # 19707
Attorney for Robert Sherman Berry
Ayers Law Firm, P.L.L.C.
1312 N. Monroe Street, Suite 133
Spokane, WA 99201
Telephone/Fax: (509) 252-6005
Email: walter@ayerslawfirm.net